NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
KERRY L. QUINN (Cal. Bar No. 302954)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-5423
     Facsimile: (213) 894-6269
     E-mail:   Kerry.L.Quinn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>PETER MICHNO,<br><br>              Defendant. | SA CR No. 18-234-AG<br><br>PLEA AGREEMENT FOR DEFENDANT<br>PETER MICHNO |

     1.   This constitutes the plea agreement between PETER MICHNO ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case. This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

                    DEFENDANT'S OBLIGATIONS

     2.   Defendant agrees to:

          a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count supplemental

information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with conspiracy to commit wire fraud involving deprivation of honest services in violation of 18 U.S.C. § 371.

b. Not contest facts agreed to in this agreement.

c. Abide by all agreements regarding sentencing contained in this agreement.

d. Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e. Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f. Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g. Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

h. Not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.

i. Not file an appeal or collateral attack that violates, in any way, any term set forth in the sections below entitled "WAIVER OF APPEAL OF CONVICTION," "LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE," "WAIVER OF COLLATERAL ATTACK" (i.e., paragraphs 21, 22, and 24).

1  3. Defendant further agrees to cooperate fully with the USAO,
2 the Federal Housing Finance Agency Office of Inspector General, and,
3 as directed by the USAO, any other federal, state, local, or foreign
4 prosecuting, enforcement, administrative, or regulatory authority.
5 This cooperation requires defendant to:

6   a. Respond truthfully and completely to all questions
7 that may be put to defendant, whether in interviews, before a grand
8 jury, or at any trial or other court proceeding.

9   b. Attend all meetings, grand jury sessions, trials or
10 other proceedings at which defendant's presence is requested by the
11 USAO or compelled by subpoena or court order.

12   c. Produce voluntarily all documents, records, or other
13 tangible evidence relating to matters about which the USAO, or its
14 designee, inquires.

15   d. If requested to do so by the USAO, act in an
16 undercover capacity to the best of defendant's ability in connection
17 with criminal investigations by federal, state, local, or foreign law
18 enforcement authorities, in accordance with the express instructions
19 of those law enforcement authorities.  Defendant agrees not to act in
20 an undercover capacity, tape record any conversations, or gather any
21 evidence except after a request by the USAO and in accordance with
22 express instructions of federal, state, local, or foreign law
23 enforcement authorities.

24  4. For purposes of this agreement: (1) "Cooperation
25 Information" shall mean any statements made, or documents, records,
26 tangible evidence, or other information provided, by defendant
27 pursuant to defendant's cooperation under this agreement; and
28 (2) "Plea Information" shall mean any statements made by defendant,

1  under oath, at the guilty plea hearing and the agreed to factual
2  basis statement in this agreement.

3                        THE USAO'S OBLIGATIONS

4      5.   The USAO agrees to:

5           a.   Not contest facts agreed to in this agreement.

6           b.   Abide by all agreements regarding sentencing contained
7  in this agreement.

8           c.   At the time of sentencing, move to dismiss the
9  underlying indictment as against defendant.  Defendant agrees,
10 however, that at the time of sentencing the Court may consider any
11 dismissed charges in determining the applicable Sentencing Guidelines
12 range, the propriety and extent of any departure from that range, and
13 the sentence to be imposed.

14          d.   At the time of sentencing, provided that defendant
15 demonstrates an acceptance of responsibility for the offense up to
16 and including the time of sentencing, recommend a two-level reduction
17 in the applicable Sentencing Guidelines offense level, pursuant to
18 U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an
19 additional one-level reduction if available under that section.

20          e.   Except for criminal tax violations (including
21 conspiracy to commit such violations chargeable under 18 U.S.C.
22 § 371), not further criminally prosecute defendant for violations of
23 18 U.S.C. §§ 641, 642, 656, 657, 666, 1005, 1006, 1028, 1028A, 1029,
24 1341, 1343, 1344, 1956, or 1957, arising out of defendant's conduct
25 described in the agreed-to factual basis set forth in Exhibit B to
26 this agreement.  Defendant understands that the USAO is free to
27 criminally prosecute defendant for any other unlawful past conduct or
28 any unlawful conduct that occurs after the date of this agreement.

1  Defendant agrees that at the time of sentencing the Court may
2  consider the uncharged conduct in determining the applicable
3  Sentencing Guidelines range, the propriety and extent of any
4  departure from that range, and the sentence to be imposed after
5  consideration of the Sentencing Guidelines and all other relevant
6  factors under 18 U.S.C. § 3553(a).

7       6.   The USAO further agrees:

8            a.   Not to offer as evidence in its case-in-chief in the
9  above-captioned case or any other criminal prosecution that may be
10 brought against defendant by the USAO, or in connection with any
11 sentencing proceeding in any criminal case that may be brought
12 against defendant by the USAO, any Cooperation Information.
13 Defendant agrees, however, that the USAO may use both Cooperation
14 Information and Plea Information: (1) to obtain and pursue leads to
15 other evidence, which evidence may be used for any purpose, including
16 any criminal prosecution of defendant; (2) to cross-examine defendant
17 should defendant testify, or to rebut any evidence offered, or
18 argument or representation made, by defendant, defendant's counsel,
19 or a witness called by defendant in any trial, sentencing hearing, or
20 other court proceeding; and (3) in any criminal prosecution of
21 defendant for false statement, obstruction of justice, or perjury.

22           b.   Not to use Cooperation Information against defendant
23 at sentencing for the purpose of determining the applicable guideline
24 range, including the appropriateness of an upward departure, or the
25 sentence to be imposed, and to recommend to the Court that
26 Cooperation Information not be used in determining the applicable
27 guideline range or the sentence to be imposed.  Defendant
28 understands, however, that Cooperation Information will be disclosed

5

1   to the United States Probation and Pretrial Services Office and the
2   Court, and that the Court may use Cooperation Information for the
3   purposes set forth in U.S.S.G § 1B1.8(b) and for determining the
4   sentence to be imposed.

5         c.   In connection with defendant's sentencing, to bring to
6   the Court's attention the nature and extent of defendant's
7   cooperation.

8         d.   If the USAO determines, in its exclusive judgment,
9   that defendant has both complied with defendant's obligations under
10  paragraphs 2 and 3 above and provided substantial assistance to law
11  enforcement in the prosecution or investigation of another
12  ("substantial assistance"), to move the Court pursuant to U.S.S.G.
13  § 5K1.1 to fix an offense level and corresponding guideline range
14  below that otherwise dictated by the sentencing guidelines, and to
15  recommend a term of imprisonment within this reduced range.

16       DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION
17    7.   Defendant understands the following:

18        a.   Any knowingly false or misleading statement by
19  defendant will subject defendant to prosecution for false statement,
20  obstruction of justice, and perjury and will constitute a breach by
21  defendant of this agreement.

22        b.   Nothing in this agreement requires the USAO or any
23  other prosecuting, enforcement, administrative, or regulatory
24  authority to accept any cooperation or assistance that defendant may
25  offer, or to use it in any particular way.

26        c.   Defendant cannot withdraw defendant's guilty plea if
27  the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a
28  reduced guideline range or if the USAO makes such a motion and the

6

1   Court does not grant it or if the Court grants such a USAO motion but
2   elects to sentence above the reduced range.

3         d.    At this time the USAO makes no agreement or
4   representation as to whether any cooperation that defendant has
5   provided or intends to provide constitutes or will constitute
6   substantial assistance.  The decision whether defendant has provided
7   substantial assistance will rest solely within the exclusive judgment
8   of the USAO.

9         e.    The USAO's determination whether defendant has
10  provided substantial assistance will not depend in any way on whether
11  the government prevails at any trial or court hearing in which
12  defendant testifies or in which the government otherwise presents
13  information resulting from defendant's cooperation.

14                      NATURE OF THE OFFENSE

15  8.    Defendant understands that for defendant to be guilty of
16  the crime charged in count one of the supplemental information, that
17  is, conspiracy to commit wire fraud involving deprivation of the
18  right to honest services, in violation of Title 18, United States
19  Code, Section 371, the following must be true:

20        First, beginning in or about November 2010, and continuing
21        until at least in or about March 2014, there was an agreement
22        between two or more persons to commit the crime of wire fraud
23        involving deprivation of the right to honest services, as
24        charged in the supplemental information;

25        Second, the defendant became a member of the conspiracy
26        knowing of its object and intending to help accomplish it; and

27
28

                              7

1          Third, one of the members of the conspiracy performed at
2     least one overt act for the purpose of carrying out the
3     conspiracy.
4     9.   The conspiracy to which defendant has agreed to plead
5  guilty involves an agreement to commit the substantive offense of
6  wire fraud involving deprivation of the right to honest services (18
7  U.S.C. §§ 1343, 1346).
8     The elements of wire fraud involving deprivation of the right to
9  honest services are as follows:
10         First, the defendant devised or knowingly participated in a
11     scheme or plan to deprive the Federal National Mortgage
12     Association ("Fannie Mae") of its right to honest services;
13         Second, the scheme or plan consisted of a bribe or kickback
14     arrangement in exchange for a person's services.  The "exchange"
15     may be express or may be implied from all the surrounding
16     circumstances;
17         Third, the person owed a fiduciary duty to Fannie Mae;
18         Fourth, the defendant acted with the intent to defraud by
19     depriving Fannie Mae of its right of honest services;
20         Fifth, the defendant's act was material, that is, it had a
21     natural tendency to influence, or was capable of influencing, a
22     person's or entity's acts; and
23         Sixth, the defendant used, or caused to be used, an
24     interstate or foreign wire communication to carry out or attempt
25     to carry out an essential part of the scheme.
26  A "fiduciary" duty exists whenever a person or entity places
27  special trust and confidence in another person – the fiduciary – in
28  reliance that the fiduciary will exercise his or her discretion and

8

1   expertise with the utmost honesty and forthrightness in the interests
2   of the person or entity, such that the person or entity relaxes the
3   care and vigilance that he, she, or it would ordinarily exercise, and
4   the fiduciary knowingly accepts that special trust and confidence and
5   thereafter undertakes to act on behalf of the other person or entity
6   based on such reliance.

7                       PENALTIES AND RESTITUTION

8        10.   Defendant understands that the statutory maximum sentence
9   that the Court can impose for a violation of Title 18, United States
10  Code, Section 371, is: 5 years imprisonment; a 3-year period of
11  supervised release; a fine of $250,000 or twice the gross gain or
12  gross loss resulting from the offense, whichever is greatest; and a
13  mandatory special assessment of $100.

14       11.   Defendant understands that defendant will be required to
15  pay full restitution to the victim(s) of the offense to which
16  defendant is pleading guilty.  Defendant agrees that, in return for
17  the USAO's compliance with its obligations under this agreement, the
18  Court may order restitution to persons other than the victim(s) of
19  the offense to which defendant is pleading guilty and in amounts
20  greater than those alleged in the count to which defendant is
21  pleading guilty.  In particular, defendant agrees that the Court may
22  order restitution to any victim of any of the following for any
23  losses suffered by that victim as a result: (a) any relevant conduct,
24  as defined in U.S.S.G. § 1B1.3, in connection with the offense to
25  which defendant is pleading guilty; and (b) any counts dismissed and
26  charges not prosecuted pursuant to this agreement as well as all
27  relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with
28  those counts and charges.  The parties currently believe that the

applicable amount of restitution is approximately $950,000, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing. Defendant understands and agrees that any and all restitution ordered by the Court will be due immediately and will be immediately payable and enforceable by the government upon entry of judgment. The parties agree that any payment schedule set by the Court represents a minimum payment obligation that does not preclude the government from pursuing any and all available remedies by which to satisfy defendant's payment of the full financial obligation.

12. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

13. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the Court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation,

10

1  parole, or supervised release in another case and suspension or

2  revocation of a professional license.  Defendant understands that

3  unanticipated collateral consequences will not serve as grounds to

4  withdraw defendant's guilty plea.

5      14.  Defendant understands that, if defendant is not a United

6  States citizen, the felony conviction in this case may subject

7  defendant to: removal, also known as deportation, which may, under

8  some circumstances, be mandatory; denial of citizenship; and denial

9  of admission to the United States in the future.  The Court cannot,

10 and defendant's attorney also may not be able to, advise defendant

11 fully regarding the immigration consequences of the felony conviction

12 in this case.  Defendant understands that unexpected immigration

13 consequences will not serve as grounds to withdraw defendant's guilty

14 plea.

15                          FACTUAL BASIS

16     15.  Defendant admits that defendant is, in fact, guilty of the

17 offense to which defendant is agreeing to plead guilty.  Defendant

18 and the USAO agree to the statement of facts set forth in Exhibit B

19 to this agreement and incorporated herein by reference, and agree

20 that this statement of facts is sufficient to support a plea of

21 guilty to the charge described in this agreement and to establish the

22 Sentencing Guidelines factors set forth in paragraph 17 below but is

23 not meant to be a complete recitation of all facts relevant to the

24 underlying criminal conduct or all facts known to either party that

25 relate to that conduct.

26                        SENTENCING FACTORS

27     16.  Defendant understands that in determining defendant's

28 sentence the Court is required to calculate the applicable Sentencing

                               11

Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

17.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level: | | 12 | [U.S.S.G. § 2X1.1, 2C1.1(a)(2)] |
| Specific Offense Characteristics | | | |
| Offense involved more than one bribe | +2 | | [U.S.S.G. § 2C1.1(b)(1)] |
| Value of benefit received exceeded $1,500,000 | +16 | | [U.S.S.G. § 2C1.1(b)(2); U.S.S.G. § 2B1.1(b)(I)] |
| Adjustments | | | |
| Abuse of position of trust / use of special skill | +2 | | [U.S.S.G. § 3B1.3] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate, including without limitation the application of the enhancement under U.S.S.G § 2C1.1(b)(3) for an offense that involved a public official in a high-level decision-making or sensitive position.

18.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

19.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

20.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel – and if necessary have the court appoint counsel – at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the court appoint counsel – at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.   The right to confront and cross-examine witnesses against defendant.

f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

13

1         h.   Any and all rights to pursue any affirmative defenses,

2 Fourth Amendment or Fifth Amendment claims, and other pretrial

3 motions that have been filed or could be filed.

4                WAIVER OF APPEAL OF CONVICTION

5    21.  Defendant understands that, with the exception of an appeal

6 based on a claim that defendant's guilty plea was involuntary, by

7 pleading guilty defendant is waiving and giving up any right to

8 appeal defendant's conviction on the offense to which defendant is

9 pleading guilty. Defendant understands that this waiver includes, but

10 is not limited to, arguments that the statute to which defendant is

11 pleading guilty is unconstitutional, and any and all claims that the

12 statement of facts provided herein is insufficient to support

13 defendant's plea of guilty.

14      LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

15    22.  Defendant agrees that, provided the Court imposes a total

16 term of imprisonment of no more than the statutory maximum set forth

17 above, defendant gives up the right to appeal all of the following:

18 (a) the procedures and calculations used to determine and impose any

19 portion of the sentence; (b) the term of imprisonment imposed by the

20 Court; (c) the fine imposed by the Court, provided it is within the

21 statutory maximum; (d) to the extent permitted by law, the

22 constitutionality or legality of defendant's sentence, provided it is

23 within the statutory maximum; (e) the amount and terms of any

24 restitution order, provided it requires payment of no more than

25 $950,000; (f) the term of probation or supervised release imposed by

26 the Court, provided it is within the statutory maximum; and (g) any

27 of the following conditions of probation or supervised release

28 imposed by the Court: the conditions set forth in General Orders 318

1  and 18-10 of this Court; the drug testing conditions mandated by 18
2  U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use
3  conditions authorized by 18 U.S.C. § 3563(b)(7).

4    23.  The USAO agrees that, provided (a) all portions of the
5  sentence are at or below the statutory maximum specified above and
6  (b) the Court imposes a term of imprisonment of no less than the
7  statutory maximum set forth above, the USAO gives up its right to
8  appeal any portion of the sentence, with the exception that the USAO
9  reserves the right to appeal the amount of restitution ordered.

10                    WAIVER OF COLLATERAL ATTACK

11    24.  Defendant also gives up any right to bring a post-
12  conviction collateral attack on the conviction or sentence, including
13  any order of restitution, except a post-conviction collateral attack
14  based on a claim of ineffective assistance of counsel, a claim of
15  newly discovered evidence, or an explicitly retroactive change in the
16  applicable Sentencing Guidelines, sentencing statutes, or statutes of
17  conviction. Defendant understands that this waiver includes, but is
18  not limited to, arguments that the statute to which defendant is
19  pleading guilty is unconstitutional, and any and all claims that the
20  statement of facts provided herein is insufficient to support
21  defendant's plea of guilty.

22                RESULT OF WITHDRAWAL OF GUILTY PLEA

23    25.  Defendant agrees that if, after entering a guilty plea
24  pursuant to this agreement, defendant seeks to withdraw and succeeds
25  in withdrawing defendant's guilty plea on any basis other than a
26  claim and finding that entry into this plea agreement was
27  involuntary, then (a) the USAO will be relieved of all of its
28  obligations under this agreement, including in particular its

                                15

obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## RESULT OF VACATUR, REVERSAL OR SET-ASIDE

26. Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

## EFFECTIVE DATE OF AGREEMENT

27. This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

16

## BREACH OF AGREEMENT

28.  Defendant agrees that if defendant, at any time after the effective date of this agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated to dismiss or not to criminally prosecute pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information

17

and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.   In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

29.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

18

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
## OFFICE NOT PARTIES

30.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

31.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 17 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

19

32.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.   Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

33.   Defendant understands that, except as set forth herein and in Tolling Agreements that defendant executed, effective as of May 21, 2018, and July 6, 2018, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//
//
//
//
//
//

1    <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

2       34.   The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    NICOLA T. HANNA
     United States Attorney

9

10   _____              12 / 27 / 18
     KERRY L. QUINN                               Date
11   Assistant United States Attorney

12   _____              12 / 26 / 18
     PETER MICHNO                                 Date
13   Defendant

     _____              12 / 26 / 18
14   KATE CORRIGAN                                Date
     Attorney for Defendant
15   PETER MICHNO

16                    CERTIFICATION OF DEFENDANT

17       I have read this agreement in its entirety.  I have had enough

18   time to review and consider this agreement, and I have carefully and

19   thoroughly discussed every part of it with my attorney.  I understand

20   the terms of this agreement, and I voluntarily agree to those terms.

21   I have discussed the evidence with my attorney, and my attorney has

22   advised me of my rights, of possible pretrial motions that might be

23   filed, of possible defenses that might be asserted either prior to or

24   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

25   of relevant Sentencing Guidelines provisions, and of the consequences

26   of entering into this agreement.  No promises, inducements, or

27   representations of any kind have been made to me other than those

28   contained in this agreement.  No one has threatened or forced me in

                                  21

1   any way to enter into this agreement.  I am satisfied with the

2   representation of my attorney in this matter, and I am pleading

3   guilty because I am guilty of the charge and wish to take advantage

4   of the promises set forth in this agreement, and not for any other

5   reason.

6

7   _____        _____
    PETER MICHNO                           Date

8   Defendant

                    CERTIFICATION OF DEFENDANT'S ATTORNEY

9       I am PETER MICHNO's attorney.  I have carefully and thoroughly

10  discussed every part of this agreement with my client.  Further, I

11  have fully advised my client of his rights, of possible pretrial

12  motions that might be filed, of possible defenses that might be

13  asserted either prior to or at trial, of the sentencing factors set

14  forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

15  provisions, and of the consequences of entering into this agreement.

16  To my knowledge: no promises, inducements, or representations of any

17  kind have been made to my client other than those contained in this

18  agreement; no one has threatened or forced my client in any way to

19  enter into this agreement; my client's decision to enter into this

20  agreement is an informed and voluntary one; and the factual basis set

21  forth in this agreement is sufficient to support my client's entry of

22  a guilty plea pursuant to this agreement.

23

24  _____        _____
    KATE CORRIGAN                          Date

25  Attorney for Defendant
    PETER MICHNO

26

27

28

                                        22

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>PETER MICHNO,<br><br>        Defendant. | SA CR No. 18-234(A)-AG<br><br>S U P P L E M E N T A L<br>I N F O R M A T I O N<br><br>[18 U.S.C. § 371: Conspiracy to Commit Wire Fraud Involving Deprivation of Honest Services] |

The United States Attorney charges:

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

1.   At all times relevant to this Information:

a.   The Federal National Mortgage Association ("Fannie Mae") was a private corporation, under conservatorship by the Federal Housing Finance Agency, and doing business in Irvine, California, within the Central District of California, and elsewhere.  In the ordinary course of its business, Fannie Mae acquired residential properties through foreclosure and other transfers to Fannie Mae, and Fannie Mae then sold those properties, commonly referred to as Fannie Mae Real Estate Owned or REO properties, into the market.

1      b.   Defendant PETER MICHNO ("MICHNO") was a broker
2 approved to list Fannie Mae REO properties for sale.  Defendant
3 MICHNO was entitled to receive a commission from the sale of REO
4 properties as compensation for his services.  As a Fannie Mae-
5 approved real estate broker, defendant MICHNO was not authorized to
6 purchase Fannie Mae REO properties for himself or for his friends,
7 relatives, and associates.  Defendant MICHNO was also not permitted
8 to pay referral fees, bribes, or kickbacks to Fannie Mae employees in
9 exchange for listing opportunities or approval of below-market sales.
10      c.   Shirene Hernandez ("Hernandez"), co-conspirator no. 1
11 ("CC-1"), and other co-conspirators were employed by Fannie Mae in
12 Irvine, California, as Real Estate Owned Foreclosure Specialists and
13 Sales Representatives (the "Fannie Mae Asset Managers").  The Fannie
14 Mae Asset Managers were responsible for, among other things,
15 assigning Fannie Mae REO property listings to approved brokers, and
16 approving sales offers submitted by brokers for the sale of Fannie
17 Mae REO properties.  The Fannie Mae Asset Managers were not permitted
18 to receive referral fees, bribes, or kickbacks in exchange for
19 assigning listings or approving below-market sales.
20 B.   THE OBJECT OF THE CONSPIRACY
21      2.   Beginning in or about November 2010 and continuing through
22 at least in or about March 2014 in Orange County, within the Central
23 District of California, and elsewhere, defendant MICHNO, together
24 with Hernandez, CC-1, and others known and unknown to the United
25 States Attorney, knowingly combined, conspired, and agreed with each
26 other to commit the crime of wire fraud involving deprivation of
27 honest services, in violation of Title 18, United States Code,
28 Sections 1343 and 1346.

2

C.   THE MANNER AND MEANS OF THE CONSPIRACY

3.   The object of the conspiracy was carried out, and was to be carried out, in substance, as follows:

a.   Fannie Mae Asset Managers, including Hernandez and CC-1, would communicate to defendant MICHNO and other conspiring brokers their demands for bribes and kickbacks, demanding these bribes and kickbacks in exchange for the assignment of listings and the approval of below-market sales of Fannie Mae REO properties.

b.   Defendant MICHNO and other conspiring brokers would agree to pay and did pay bribes and kickbacks to Fannie Mae Asset Managers, including Hernandez and CC-1, in exchange for the assignment of listings and the approval of below-market sales of Fannie Mae REO properties.

c.   As a result of the bribes and kickbacks, Fannie Mae Asset Managers, including Hernandez and CC-1, in the performance of their official duties at Fannie Mae would assign listings to defendant MICHNO and other conspiring brokers, and defendant MICHNO and other conspiring brokers would earn commissions on the sale of these properties. Also as a result of these bribes and kickbacks, Fannie Mae Asset Managers, in the same capacity, would approve below-market sales of Fannie Mae REO properties to defendant MICHNO and other conspiring brokers.

d.   Defendant MICHNO and other conspiring brokers would meet Fannie Mae Asset Managers in person, and send others to meet them in person, to pay them cash for the negotiated bribes and kickbacks, as well as mailing cash and depositing cash into their bank accounts and bank accounts of their associates for this same purpose. Defendant MICHNO and other conspiring brokers would also

1   transfer Fannie Mae REO properties purchased at below-market prices
2   to Fannie Mae Asset Managers and their affiliates, also as kickbacks
3   for the performance of their official duties.
4          e.   Hernandez, CC-1, and other conspiring Fannie Mae Asset
5   Managers would communicate with each other about the bribes and
6   kickbacks and would recommend brokers, including defendant MICHNO,
7   based on the brokers' willingness to pay bribes and kickbacks to
8   Fannie Mae Asset Managers in exchange for the performance of official
9   duties.
10  D.   OVERT ACTS
11         4.   On or about the following dates, in furtherance of the
12  conspiracy and to accomplish its object, defendant MICHNO, together
13  with Hernandez, CC-1, and others known and unknown to the United
14  States Attorney, committed and willfully caused others to commit the
15  following overt acts, among others, in the Central District of
16  California and elsewhere:
17         Overt Act No. 1:  On or about April 29, 2011, defendant MICHNO,
18  through an affiliate he controlled, purchased a property on Sunnymere
19  Avenue in Oakland, California 94605, in a below-market transaction
20  approved by Hernandez in exchange for a kickback.
21         Overt Act No. 2:  On or about June 1, 2011, defendant MICHNO,
22  through an affiliate he controlled, purchased a property on A Street
23  in Hayward, California 94541 in a below-market transaction approved
24  by Hernandez in exchange for a kickback.
25         Overt Act No. 3:  On or about November 22, 2011, defendant
26  MICHNO, through an affiliate he controlled, purchased a property on
27  Jensen Street in Livermore, California 94550, in a below market
28  transaction approved by Hernandez in exchange for a kickback.

1    Overt Act No. 4:  On or about November 23, 2011, defendant
2  MICHNO, through an affiliate he controlled, purchased a property on
3  Clarke Avenue in Livermore, California 94551, in a below-market
4  transaction approved by Hernandez in exchange for a kickback.
5    Overt Act No. 5:  On or about January 13, 2012, defendant MICHNO
6  deposited approximately $1,300 in cash into a bank account that CC-1
7  maintained at Wells Fargo, N.A., bearing account number ending in
8  1636 (the "CC-1 Bank Account"), as a kickback to CC-1 in exchange for
9  the performance of CC-1's official duties.
10    Overt Act No. 6:  On or about March 30, 2012, defendant MICHNO,
11  through an affiliate he controlled, purchased a property on Sunkist
12  Drive in Oakland, California 94605, in a below-market transaction
13  approved by Hernandez in exchange for a kickback.
14    Overt Act No. 7:  On or about August 29, 2012, Hernandez, in the
15  performance of her official duties at Fannie Mae in Irvine,
16  California, rejected an offer of $333,000 from a bona fide purchaser
17  for value for a Fannie Mae REO property on Vailetti Drive in Sonoma,
18  California 95476 (the "Vailetti Property").
19    Overt Act No. 8:  On or about September 4, 2012, Hernandez, in
20  the performance of her official duties at Fannie Mae in Irvine,
21  California, rejected an offer of $390,000 from a bona fide purchaser
22  for value for the Vailetti property.
23    Overt Act No. 9:  On or about November 30, 2012, defendant
24  MICHNO, through an affiliate he controlled, purchased a property on
25  El Caminito in Livermore, California 94550, in a below-market
26  transaction approved by Hernandez in exchange for a kickback.
27    Overt Act No. 10:  On or about December 18, 2012, defendant
28  MICHNO deposited approximately $650 in cash into the CC-1 Bank

1  Account as a kickback to CC-1 in exchange for the performance of CC-
2  1's official duties.
3      Overt Act No. 11:  On or about March 5, 2013, defendant MICHNO
4  deposited approximately $1,350 in cash into the CC-1 Bank Account as
5  a kickback to CC-1 in exchange for the performance of CC-1's official
6  duties.
7      Overt Act No. 12:  On or about March 26, 2013, defendant MICHNO,
8  through an affiliate he controlled, purchased a property on Brookdale
9  Court in Dublin, California 94568 (the "Brookdale Property"), in a
10 below-market transaction approved by Hernandez in exchange for a
11 kickback.
12     Overt Act No. 13:  On or about March 20, 2013, Hernandez, in the
13 performance of her official duties at Fannie Mae in Irvine,
14 California, accepted an offer of approximately $329,900 from
15 defendant MICHNO, through an affiliate he controlled, for the
16 Vailetti property, for transfer to her and her affiliates, after
17 having rejected offers of $333,000 and $390,000 for the same
18 property.
19     Overt Act No. 14:  On or about March 27, 2013, defendant MICHNO
20 and Hernandez caused an interstate wire transfer to be sent in the
21 approximate amount of $369,407 from an escrow account at Comerica
22 Bank to Fannie Mae for the purchase of the Brookdale Property.
23     Overt Act No. 15:  On or about May 15, 2013, defendant MICHNO
24 deposited approximately $2,150 in cash into the CC-1 Bank Account as
25 a kickback to CC-1 in exchange for the performance of CC-1's official
26 duties.
27     Overt Act No. 16:  On or about May 20, 2013, defendant MICHNO,
28 through an affiliate he controlled, purchased a property on Cherry

6

1  Hills Drive in Discovery Bay, California 94505 in a below-market
2  transaction approved by CC-1 in exchange for a kickback.
3      Overt Act No. 17:  On or about May 24, 2013, defendant MICHNO
4  and Hernandez caused an interstate wire transfer to be sent in the
5  approximate amount of $312,257 from an escrow account at Comerica
6  Bank to Fannie Mae for the purchase of the Vailetti Property.
7      Overt Act No. 18:  On or about May 30, 2013, defendant MICHNO
8  deposited approximately $1,854 in cash into the CC-1 Bank Account as
9  a kickback to CC-1 in exchange for the performance of CC-1's official
10  duties.
11      Overt Act No. 19:  On or about June 11, 2013, defendant MICHNO
12  deposited approximately $1,375 in cash into the CC-1 Bank Account as
13  a kickback to CC-1 in exchange for the performance of CC-1's official
14  duties.
15      Overt Act No. 20:  On or about June 20, 2013, CC-1, in the
16  performance of CC-1's official duties at Fannie Mae in Irvine,
17  California, accepted a below-market offer from defendant MICHNO,
18  through an affiliate he controlled, of approximately $351,000 for the
19  sale of a Fannie Mae REO property on Rosemary Lane, in Concord,
20  California 94518 (the "Rosemary property").
21      Overt Act No. 21:  On or about June 27, 2013, defendant MICHNO,
22  through an affiliate he controlled, purchased the Rosemary property
23  in a below-market transaction approved by CC-1 in exchange for a
24  kickback.
25      Overt Act No. 22:  On or about July 2, 2013, defendant MICHNO
26  deposited approximately $1,000 in cash into the CC-1 Bank Account as
27  a kickback to CC-1 in exchange for the performance of CC-1's official
28  duties.

1       Overt Act No. 23:   On or about July 16, 2013, defendant MICHNO,

2   through an affiliate he controlled, transferred the Vailetti property

3   to Hernandez's affiliate.

4       Overt Act No. 24:   On or about August 2, 2013, defendant MICHNO

5   deposited approximately $1,850 in cash into the CC-1 Bank Account as

6   a kickback to CC-1 in exchange for the performance of CC-1's official

7   duties.

8       Overt Act No. 25:   On or about August 24, 2013, defendant MICHNO

9   deposited approximately $1,425 in cash into the CC-1 Bank Account as

10  a kickback to CC-1 in exchange for the performance of CC-1's official

11  duties.

12      Overt Act No. 26:   On or about October 2, 2013, defendant MICHNO

13  deposited approximately $2,125 in cash into the CC-1 Bank Account as

14  a kickback to CC-1 in exchange for the performance of CC-1's official

15  duties.

16      Overt Act No. 27:   On or about October 30, 2013, defendant

17  MICHNO deposited approximately $1,525 in cash into the CC-1 Bank

18  Account as a kickback to CC-1 in exchange for the performance of CC-

19  1's official duties.

20      Overt Act No. 28:   On or about November 18, 2013, defendant

21  MICHNO deposited approximately $985 in cash into the CC-1 Bank

22  Account as a kickback to CC-1 in exchange for the performance of CC-

23  1's official duties.

24      Overt Act No. 29:   On or about February 3, 2014, defendant

25  MICHNO deposited approximately $1,325 in cash into the CC-1 Bank

26  //

27  //

28

1    Account as a kickback to CC-1 in exchange for the performance of CC-

2    1's official duties.

3
                              NICOLA T. HANNA
4                             United States Attorney

5

6                             LAWRENCE S. MIDDLETON
                              Assistant United States Attorney
7                             Chief, Criminal Division

8                             RANEE A. KATZENSTEIN
                              Assistant United States Attorney
9                             Chief, Major Frauds Section

10                            MONICA TAIT
                              Assistant United States Attorney
11                            Deputy Chief, Major Frauds Section

12                            KERRY L. QUINN
                              Assistant United States Attorney
13                            Major Frauds Section

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

1        <u>EXHIBIT B To Plea Agreement for Defendant Peter Michno</u>

2        At all times relevant to the supplemental information, and as

3    defendant Peter Michno ("defendant") then well knew:

4        A.    The Federal National Mortgage Association ("Fannie Mae")

5    was a private corporation, under conservatorship by the Federal

6    Housing Finance Agency ("FHFA"), and doing business in Irvine,

7    California, within the Central District of California, and

8    elsewhere.  In the ordinary course of its business, Fannie Mae

9    acquired residential properties through foreclosure and other

10   transfers to Fannie Mae, and Fannie Mae then sold those properties,

11   commonly referred to as Fannie Mae Real Estate Owned or REO

12   properties, into the market.

13       B.    Defendant was a broker approved to list Fannie Mae REO

14   properties for sale.  Defendant was entitled to receive a commission

15   from the sale of REO properties as compensation for his services.

16   As a Fannie Mae-approved real estate broker, defendant was not

17   authorized to purchase Fannie Mae REO properties for himself or for

18   his friends, relatives, and associates.  Defendant was also not

19   permitted to pay referral fees, bribes, or kickbacks to Fannie Mae

20   employees in exchange for listing opportunities or approval of

21   below-market sales.

22       C.    Shirene Hernandez ("Hernandez"), co-conspirator no. 1, and

23   other co-conspirators were employed by Fannie Mae in Irvine,

24   California, as Real Estate Owned Foreclosure Specialists and Sales

25   Representatives (the "Fannie Mae Asset Managers").  The Fannie Mae

26   Asset Managers were responsible for, among other things, assigning

27   Fannie Mae REO property listings to approved brokers ("brokers"),

28   and approving sales offers submitted by brokers for the sale of

                                1              Agreed and Accepted: _PM_

1  Fannie Mae REO properties.  The Fannie Mae Asset Managers were not

2  permitted to receive referral fees, bribes, or kickbacks in exchange

3  for assigning listings or approving below-market sales.

4      D.   Despite these restrictions, defendant agreed to pay and

5  did pay bribes and kickbacks to Fannie Mae Asset Managers for

6  listing opportunities and for approval of below-market offers on

7  Fannie Mae REO properties.  In this way, defendant made over $1.65

8  million in commissions from the sales of Fannie Mae REO properties,

9  and over $950,000 from the re-sale of Fannie Mae REO properties that

10  defendant purchased for his own account (through intermediaries and

11  associates) at below-market prices that Fannie Mae Asset Managers

12  approved because of the bribes and kickbacks.  Thus, the total

13  profit that defendant made, that is, the benefits received, from the

14  bribes and kickbacks was more than $2.6 million.

15      E.   Defendant knew at the time he was engaged in the above

16  conduct that it was improper and unlawful to pay bribes and

17  kickbacks to Fannie Mae Asset Managers in exchange for listing

18  opportunities and below-market sales, but he nevertheless engaged in

19  the conduct, and in so doing he acted with the intent to defraud

20  Fannie Mae of its right to honest services.  The Fannie Mae Asset

21  Managers that defendant bribed and to whom he paid kickbacks were

22  public officials insofar as they had official responsibility for an

23  important government program and occupied positions of trust in

24  their work for Fannie Mae, which was under conservatorship of the

25  FHFA at all relevant times.  Defendant used his position as an

26  approved real estate broker with Fannie Mae to carry out the fraud

27  and to obtain the benefits he obtained as a result of the fraud.  In

28

                                2                    Agreed and Accepted:  PM

1   this way, he abused a position of trust and used special skills in

2   the real estate industry to execute the fraudulent scheme.

3   THE OBJECT OF THE CONSPIRACY

4       Beginning in or about November 2010 and continuing through at

5   least in or about March 2014 in Orange County, within the Central

6   District of California, and elsewhere, defendant, together with

7   Hernandez, CC-1, and others known and unknown, knowingly combined,

8   conspired, and agreed with each other to commit the crime of wire

9   fraud involving deprivation of honest services, in violation of

10   Title 18, United States Code, Sections 1343 and 1346.

11   THE MANNER AND MEANS OF THE CONSPIRACY

12       The object of the conspiracy was carried out, and was to be

13   carried out, in substance, as follows:

14           a.   Fannie Mae Asset Managers, including Hernandez and

15   CC-1, would communicate to defendant and other conspiring brokers

16   demands for bribes and kickbacks, demanding bribes and kickbacks in

17   exchange for the assignment of listings and the approval of below-

18   market sales of Fannie Mae REO properties.

19           b.   Defendant and other conspiring brokers would agree to

20   pay and did pay bribes and kickbacks to Fannie Mae Asset Managers,

21   including Hernandez and CC-1, in exchange for the assignment of

22   listings and the approval of below-market sales of Fannie Mae REO

23   properties.

24           c.   As a result of the bribes and kickbacks, Fannie Mae

25   Asset Managers, including Hernandez and CC-1, in the performance of

26   their official duties at Fannie Mae would assign listings to

27   defendant and other conspiring brokers, and defendant and other

28   conspiring brokers would earn commissions on the sale of these

               3            Agreed and Accepted: PM

1    properties.  Also as a result of these bribes and kickbacks, Fannie

2    Mae Asset Managers, in the same capacity, would approve below-market

3    sales of Fannie Mae REO properties to defendant and other conspiring

4    brokers.

5            d.    Defendant and other conspiring brokers would meet

6    Fannie Mae Asset Managers in person, and send others to meet them in

7    person, to pay them cash for the negotiated bribes and kickbacks, as

8    well as depositing cash into their bank accounts and bank accounts

9    of their associates for this same purpose.  Defendant would also

10   transfer Fannie Mae REO properties purchased at below-market prices

11   to Fannie Mae Asset Managers and their affiliates, also as kickbacks

12   for the performance of their official duties.

13           e.    Hernandez, CC-1, and other conspiring Fannie Mae

14   Asset Managers would communicate with each other about the bribes

15   and kickbacks and would recommend brokers, including defendant,

16   based on the brokers' willingness to pay bribes and kickbacks to

17   Fannie Mae Asset Managers in exchange for the performance of

18   official duties.

19   OVERT ACTS

20       On or about the following dates, in furtherance of the

21   conspiracy and to accomplish its object, defendant, together with

22   Hernandez, CC-1, and others known and unknown to the United States

23   Attorney, committed and willfully caused others to commit the

24   following overt acts, among others, in the Central District of

25   California and elsewhere:

26       Overt Act No. 1:  On or about April 29, 2011, defendant,

27   through an affiliate he controlled, purchased a property on

28

                                    4                    Agreed and Accepted:  ᴅᴍ

1  Sunnymere Avenue in Oakland, California 94605, in a below-market

2  transaction approved by Hernandez in exchange for a kickback.

3     Overt Act No. 2:  On or about June 1, 2011, defendant, through

4  an affiliate he controlled, purchased a property on A Street in

5  Hayward, California 94541 in a below-market transaction approved by

6  Hernandez in exchange for a kickback.

7     Overt Act No. 3:  On or about November 22, 2011, defendant,

8  through an affiliate he controlled, purchased a property on Jensen

9  Street in Livermore, California 94550, in a below market transaction

10 approved by Hernandez in exchange for a kickback.

11    Overt Act No. 4:  On or about November 23, 2011, defendant,

12 through an affiliate he controlled, purchased a property on Clarke

13 Avenue in Livermore, California 94551, in a below-market transaction

14 approved by Hernandez in exchange for a kickback.

15    Overt Act No. 5:  On or about January 13, 2012, defendant

16 deposited approximately $1,300 in cash into a bank account that CC-1

17 maintained at Wells Fargo, N.A., bearing account number ending in

18 1636 (the "CC-1 Bank Account"), as a kickback to CC-1 in exchange

19 for the performance of CC-1's official duties.

20    Overt Act No. 6:  On or about March 30, 2012, defendant,

21 through an affiliate he controlled, purchased a property on Sunkist

22 Drive in Oakland, California 94605, in a below-market transaction

23 approved by Hernandez in exchange for a kickback.

24    Overt Act No. 7:  On or about November 30, 2012, defendant,

25 through an affiliate he controlled, purchased a property on El

26 Caminito in Livermore, California 94550, in a below-market

27 transaction approved by Hernandez in exchange for a kickback.

28

5                          Agreed and Accepted: _Dh_

1    Overt Act No. 8:  On or about December 18, 2012, defendant

2  deposited approximately $650 in cash into the CC-1 Bank Account as a

3  kickback to CC-1 in exchange for the performance of CC-1's official

4  duties.

5    Overt Act No. 9:  On or about March 5, 2013, defendant

6  deposited approximately $1,350 in cash into the CC-1 Bank Account as

7  a kickback to CC-1 in exchange for the performance of CC-1's

8  official duties.

9    Overt Act No. 10:  On or about March 26, 2013, defendant,

10  through an affiliate he controlled, purchased a property on

11  Brookdale Court in Dublin, California 94568 (the "Brookdale

12  Property"), in a below-market transaction approved by Hernandez in

13  exchange for a kickback.

14    Overt Act No. 11:  On or about March 20, 2013, Hernandez, in

15  the performance of her official duties at Fannie Mae in Irvine,

16  California, accepted an offer of approximately $329,900 from

17  defendant, through an affiliate he controlled, for the Vailetti

18  property, for transfer to her and her affiliates.

19    Overt Act No. 12:  On or about March 27, 2013, defendant and

20  Hernandez caused an interstate wire transfer to be sent in the

21  approximate amount of $369,407 from an escrow account at Comerica

22  Bank to Fannie Mae for the purchase of the Brookdale Property.

23    Overt Act No. 13:  On or about May 15, 2013, defendant

24  deposited approximately $2,150 in cash into the CC-1 Bank Account as

25  a kickback to CC-1 in exchange for the performance of CC-1's

26  official duties.

27    Overt Act No. 14:  On or about May 20, 2013, defendant, through

28  an affiliate he controlled, purchased a property on Cherry Hills

6                          Agreed and Accepted: DM

1   Drive in Discovery Bay, California 94505 in a below-market

2   transaction approved by CC-1 in exchange for a kickback.

3      Overt Act No. 15:  On or about May 24, 2013, defendant and

4   Hernandez caused an interstate wire transfer to be sent in the

5   approximate amount of $312,257 from an escrow account at Comerica

6   Bank to Fannie Mae for the purchase of the Vailetti Property.

7      Overt Act No. 16:  On or about May 30, 2013, defendant

8   deposited approximately $1,854 in cash into the CC-1 Bank Account as

9   a kickback to CC-1 in exchange for the performance of CC-1's

10  official duties.

11     Overt Act No. 17:  On or about June 11, 2013, defendant

12  deposited approximately $1,375 in cash into the CC-1 Bank Account as

13  a kickback to CC-1 in exchange for the performance of CC-1's

14  official duties.

15     Overt Act No. 18:  On or about June 20, 2013, CC-1, in the

16  performance of CC-1's official duties at Fannie Mae in Irvine,

17  California, accepted a below-market offer from defendant, through an

18  affiliate he controlled, of approximately $351,000 for the sale of a

19  Fannie Mae REO property on Rosemary Lane, in Concord, California

20  94518 (the "Rosemary property").

21     Overt Act No. 19:  On or about June 27, 2013, defendant,

22  through an affiliate he controlled, purchased the Rosemary property

23  in a below-market transaction approved by CC-1 in exchange for a

24  kickback.

25     Overt Act No. 20:  On or about July 2, 2013, defendant

26  deposited approximately $1,000 in cash into the CC-1 Bank Account as

27  a kickback to CC-1 in exchange for the performance of CC-1's

28  official duties.

Agreed and Accepted: _____

1     Overt Act No. 21:  On or about July 16, 2013, defendant,

2   through an affiliate he controlled, transferred the Vailetti

3   property to Hernandez's affiliate.

4     Overt Act No. 22:  On or about August 2, 2013, defendant

5   deposited approximately $1,850 in cash into the CC-1 Bank Account as

6   a kickback to CC-1 in exchange for the performance of CC-1's

7   official duties.

8     Overt Act No. 23:  On or about August 24, 2013, defendant

9   deposited approximately $1,425 in cash into the CC-1 Bank Account as

10  a kickback to CC-1 in exchange for the performance of CC-1's

11  official duties.

12    Overt Act No. 24:  On or about October 2, 2013, defendant

13  deposited approximately $2,125 in cash into the CC-1 Bank Account as

14  a kickback to CC-1 in exchange for the performance of CC-1's

15  official duties.

16    Overt Act No. 25:  On or about October 30, 2013, defendant

17  deposited approximately $1,525 in cash into the CC-1 Bank Account as

18  a kickback to CC-1 in exchange for the performance of CC-1's

19  official duties.

20    Overt Act No. 26:  On or about November 18, 2013, defendant

21  deposited approximately $985 in cash into the CC-1 Bank Account as a

22  kickback to CC-1 in exchange for the performance of CC-1's official

23  duties.

24    Overt Act No. 27:  On or about February 3, 2014, defendant

25  deposited approximately $1,325 in cash into the CC-1 Bank Account as

26  a kickback to CC-1 in exchange for the performance of CC-1's

27  official duties.

28                    *      *      *

                              8              Agreed and Accepted: _PN_

1

<u>CERTIFICATION OF DEFENDANT</u>

2      I have read this STATEMENT OF FACTS IN SUPPORT OF PLEA

3  AGREEMENT ("statement of facts") in its entirety.  I have had enough

4  time to review and consider this statement of facts, and I have

5  carefully and thoroughly discussed every part of it with my

6  attorney.  I agree that this statement of facts is accurate and

7  correct, and is sufficient to support a plea of guilty to the charge

8  described in the plea agreement and to establish the Sentencing

9  Guidelines factors set forth in paragraph 17 of the plea agreement.

10

11  _____          _____
    PETER MICHNO                               Date
12  Defendant

13

14      <u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

15      I am PETER MICHNO's attorney.  I have carefully and thoroughly

16  discussed every part of this statement of facts with my client and

17  agree that it is sufficient to support a plea of guilty to the

18  charge described in the plea agreement and establish the

19  Sentencing Guidelines factors set forth in paragraph 17 of the plea

20  agreement.

21  _____          _____
    KATE CORRIGAN                              Date
22  Attorney for Defendant
    PETER MICHNO

23

24

25

26

27

28

                                      9            Agreed and Accepted: